On the record, our next case and last case of the day is Egan v. Live Nation Worldwide, number 18-1794. Whenever you're ready, counsel. Mike Schoen for Live Nation Worldwide. And I'd like to reserve five minutes for rebuttal. That would be granted. So the issue here is whether the district court erred when it concluded that plaintiff did not agree to arbitrate when he bought tickets in 2012 to a Madonna concert and also in 2017 when he attempted to buy tickets to a Counting Crows concert. So I would like to briefly highlight what I believe the main errors are and then answer any questions you may have. So the two main errors we believe that exist with respect to the 2012 agreement to arbitrate. First, the district court erred when it ruled that the defendant failed to authenticate the 2012 terms of use. Now, you don't dispute the fact that the court could have taken this up sua sponte, right? The court saw an evidentiary issue. The court is free to bring it to the attention of the parties, correct? And rule on it as the court did here. Sure, but I believe the court then should have given the defendant the opportunity to cure any perceived deficiencies. There was nothing preventing you from curing or seeking to supplement the record at any one point once the district court raised his concern and there was a period of time that you could have done that, right? Well, I didn't really see that was going to be an issue. I mean, there's a little discussion during oral argument. Well, he raised some of those issues. During oral argument, I didn't really see that as an issue until the opinion came out. That was a complete surprise to me that the authentication of the 2012 terms of use was an issue at all. I mean, the plaintiff basically conceded it. I mean, maybe the word authentication wasn't used, but I mean, the court had some concerns, which was sort of the writing on the wall, I guess you could say. Do you agree? Not in terms of the evidence with respect to the contents of the 2012 website, yes, but in terms of the authentication of the actual terms of use, not at all. Let me, because I'm a little concerned about or I have some questions regarding what I understand to be your position with regards to the 2012 purchase of the tickets. It seems to me that your position is you're not required to reproduce the exact pages that Mr. Egan will have seen in 2012 in order to establish that he agreed to be bound by the terms of use. And the issue I have, and I am not sure how I, as the district court judge, will determine whether the mere fact that he's navigating through the website resulted in a binding agreement without necessarily seeing how the terms of use disclosed appear on the page. So there are some screenshots attached to the original HAN declaration. They are from 2017, not 2012, and HAN agreed that some of the pages may have changed somewhat and he cannot reproduce them. So is it your opinion that all you need to do is, all you need is HAN's affidavit describing the disclosures that appear on each page? Or do you agree that there has to be something further, additional evidence of how the disclosure appeared on the page, where it was, what buttons you had to push, what it said, how big the font was, for there to be some evidence that he knew that he was entering into a binding agreement for the terms of use? Well, I think the evidence before the district court was sufficient in that the main argument was based on the design of the website. And we did produce screenshots from 2017 and his statements that there's no material changes in terms of you cannot purchase a ticket, period, unless you click on a button right underneath that says I accept the terms of use and there's a hyperlink to the terms of use. And several courts, based on identical evidence, in fact, based on Mr. HAN's declaration, which was virtually exactly the same, have concluded that the plaintiffs in those cases were bound by arbitration. So it's really the design of the website and not so much the exact… But you couldn't recreate it. He was not able to recreate the design of the website or how it looked at, or what Mr. Egan looked at at the time that he purchased the tickets. Well, I think what we're saying in his declaration is the screenshots that we produced were going to be substantially similar to what would have been seen in 2012 in terms of he was able to retrieve, based on the code, static content and controlled versions of certain documents. What he wasn't able to reproduce is what advertisement would have been on the website in 2012 or what the price of a ticket would have been to see a 49er game or that type of content, so static content. So if I understand it correctly, by using the code, he could tell me what is on the webpage, but he cannot tell me how the webpage looked that Mr. Egan was looking at when he was buying the ticket. He could tell you what certain features looked like, including the fact that you had to click on a button that said, I accept the terms of use, before he could purchase a ticket. What he could not do is tell you what advertisement in 2012 was on the side, what Facebook module was there, what the price of a ticket would have been in 2012 to go see a football game. What he could do is, based on the design of the website, is tell you there was no way in 2012 to buy a ticket unless you pushed on a button that said, by clicking here, you are agreeing to terms of use, and underneath was a hyperlink to terms of use. And that's what the screenshots were designed to show. And again, many courts, based on the exact same evidence, have propelled arbitration. Do we have the Wayback Machine here? Do we have screenshots that show the footer? In 2012? Yeah. We have Exhibit M, I believe is the only screenshot from 2012. So, you have some district court cases, but is there a speck we could talk about? But apart from that, is there appellate authority that shows that the footer at the bottom of a website is sufficient to create a binding agreement? Yeah, I believe there are, not that that was really a dispute in this case, but I believe there's plenty of case law that says click, it depends how you define those type of agreements, but usually I think they're defined as click wrap agreements, that they're enforceable. Right. But if we agree with you on authentication, don't we still need a trial here on whether this is such to objectively manifest assent to the terms of use that were, even if there's a hyperlink? Because we have, this case is in between click wrap and browse wrap, right? I purchase, and by purchasing I hereby agree to the terms and conditions. It's not as simple, you have to click a separate box that's just about the terms and conditions. You don't have to click it open, scroll down, say you agree on that. So, don't we need a trial on your best case scenario on that? Well, I don't know if we, I mean, I don't think we would need a trial given that the, what I see as the undisputed evidence is that, well, he had to click on a button that said I accept to purchase the agreement. If you're saying that the issue is whether click wrap agreements are enforceable, browse wraps, maybe not, this is in between, therefore we need to flesh out the record, then okay. Well, I may not be following exactly what Judge Bevis is saying, but on the last page of your brief you say you'd like us to compel arbitration. Is it really the best you can get as a trial to determine whether that occurs? Well, I think on the evidence you could. How could we do that when the best you have is this hands, Mr. Hahn's statement that virtually all the webpages in 2017 contain the terms of use, right? We have this factual dispute about what he was doing in 2012, whether he was trying to buy Madonna tickets or not. In 2017 we have this word virtually. Don't we need a trial of some sort on arbitrability? I think it would flesh the issue out because if you notice the declaration of the plaintiff, he could have just come out and said, for example, that he never clicked on a page for the 2017 agreement. I never clicked on a page. He doesn't say that. So I think it's obvious that the inference is that he did click on a page and he had to to get the message, sorry, we don't have any accessible tickets. But, yeah, sure, I would say a trial. He would be easier to flush those issues out. They sent the district court had questions from Mr. Hahn that weren't deemed ambiguous by virtue of this declaration and that doesn't testify. Then, yes, that would be very helpful. Thank you, counsel. I hear you on the rebuttal. Good morning, your honor. Please, the court. My name is Gary Lynch. I represent Johnny again. The appellee in this case. Yours. The court below did not bring up any of these evidentiary issues. The objection that was made in the district court proceedings was that the only evidence that they had to support their claim for arbitration was the testimony of Mr. Our objection was very specifically that Mr. Han did not have personal knowledge of the key facts that he had to testify to. Authentication is such a low burden. Document custodians are allowed to do it all the time with corporate records that they've never seen before. But they're in some filing cabinet or hard drive. It seems the district court's confusing authentication with the substantive issues of proof here. And I tend to agree with that. Your honor, the district court may have had a broader definition of what what authentication meant in that context. And I think what the court was suggesting is that by authentication issues, he was saying that is this term of use the actual term of use that this plaintiff saw. But then that goes back to Jack Harris's suggestion that isn't this all the kind of thing that needs to go to a trial and arbitrability. We have this precedent. We got it. It says that's where you go. We're not sure what all of virtually all means. We're not sure what it looked like exactly in 2012. There are things that kind of point in one direction or the other. So how could the district court rule against this definitively because there were open issues at summary judgment? Because there's no personal knowledge of the witness that testified. So even if the terms of use are authenticated and we can say these are terms of use that Five Nation used on a Web site in 2012, that's the beginning of the analysis. The analysis has to be what did the plaintiff see? Because remember, we're trying to come up with a clear and unmistakable manifestation of intent to arbitrate. And to show that because we don't have a signature on an agreement to arbitrate, you have to show it by the plaintiff's or the user's interaction with the Web site. And it has to be done in a context that certain notices are conspicuous enough. That's really what we're talking about. And so to do that, we have to know what the plaintiff saw. The problem is the defendant, their 30B6 designee, has now testified. They can't tell us what the plaintiff saw. So you don't get out of the gate. A reasonable finder can't look at Exhibit M, can't look at the layout, the other things that he is able to testify about, and say he wasn't there in 2012, but there's this issue. You would have had to click on something. We've got to go back and have a trial here. And that's exactly the point, Your Honor. Just being able to say they had to click on something isn't enough in this context. When you're saying there's a conspicuous disclosure being made in a certain way, under a certain layout, that would be sufficient under the case law in Pennsylvania to give that notice, to allow that interaction, that clicking of a button, to be relevant for purposes of manifesting assent, arbitration. And this witness is saying they have no personal knowledge of what the actual layout was. They can speak in generalities that there was some intent on their part to bind somebody to arbitration, but they can't say specifically how that was done. They can't say that this page. What is your rule going to mean? Every time we don't have somebody who's taken a snapshot, or the Wayback Machine hasn't archived, that therefore none of the contract terms, not just arbitration, none of the contract terms in general on websites are going to be enforceable. I'm worried you're opening a can of worms. I don't think that can of worms gets opened in this case, and here's why. The Wayback Machine was available. For some reason, the defendant didn't use it. For some reason, they didn't actually produce some shots of what that website looked like that he may have seen. And then they testified in their deposition. When I say they, I'm saying they because it was Live Nation testifying, not just Mr. Hand. There are 30B6 witnesses testifying, and I'll direct you specifically to Appendix 196, page 34 of this deposition. And this is where he talks about his inability to actually say what the plaintiff saw in terms of the layout of the page. And on that page, I'm just going to read it just very quickly, this is the question. Through this version control process, can you tell how far down this footer language is from the Submit Order button? Do you know if it's changed through the years? How far apart they have been? Answer, this page has certainly changed. I would have to check specifically. I couldn't tell you, like, how many pixels. Question, yes. Are you looking for a value? Yes. Answer, yeah. It's contingent on whether we can correctly assess the version, the specific version, according to the dates. But if we brought that, we could render and give you the number of pixels. Question, the only way you could know that is if you could render from the version control process. Correct. He later in this deposition and in his subsequent declaration conceded that they went back and tried to do some of this stuff. And, in fact, they don't have the control or the code from back then. They can't recreate that. And he doesn't have any personal memory of it because he wasn't even working at the company. So on the things that matter, and we're not suggesting, and I take issue with my opponent exaggerating our position for purposes of argument. We're not saying that they have to produce the exact screenshot that this client saw in 2012. But they have to produce something that doesn't vary in terms of what matters. And what matters is how big is the button, where is the language, what's the layout. They can't do it. But any reason to think that what they produce is materially different in 2017 than in 2012? Yes. He's saying that he cannot tell us. I just read it to you. He can't tell us how far the button is from the disclosure language or where these things lay out. All the things that matter to whether the disclosure is conspicuous enough, he can't say. And so they extend the argument to make it look weak by saying we're suggesting he has to come up with the exact page that has, you know, all the concerts that are coming up on it and whatnot and all the advertising. None of that matters. We don't need the exact page. We need a replica of the page, though, that shows the parts that do matter, which is the part that he's interacting with, from which they're asking this court to infer clear and unmistakable assent to arbitration. That's all this is about. Let's even assume we agree with you about 2012. Why don't we need a trial in arbitration as to 2017? Because we have this evidence that virtually all the Web pages contain the terms of use here. Isn't that enough to at least get us a trial on whether 2017 binds it? It would, except it's very clear from my client's deposition and his testimony and his declaration that all he did was click on the fan page of the band, The Counting Crows, which directed him directly to one page, this page, and it's appendix 181. And he never left that page. So all the assent that they asked you to infer from a user's interaction with the Web site is based upon clicking a button to go to the next page after certain disclosures were conspicuously made. He never left this page. All he did was go straight to this page. There's a little toggle button. We've all used those. You click your mouse on it and it goes green. The toggle goes over. He clicked that to see if there was accessible seating and got the answer. There's no accessible seating. That's all he did. He couldn't go any further. He didn't have no need to go any further. There were no seats for him to pick. That's his entire interaction with the Web site in 2017. And I would suggest that's not enough for any jury to reasonably conclude that he assented to anything regarding arbitration. And that's why you don't need a trial. Go back to where you started. Actually, you came out and said this was not done. So it was spontaneous. We brought up problems of competency or whatever your issue was. Now, I'm sure you know that Federal Rule of Evidence 103A1 says you've got to be pretty specific. I didn't see your objection mentioning authenticity. It probably didn't occur to you, is my guess, but I don't know if it occurred to me. Because the authenticity of just the terms and conditions is not what we were really objecting to. We were objecting to this witness as having a broader issue, which is having no foundation and no personal knowledge. I get it. I get it. But the issue is, does then the other side need notice? So you're saying it's not sui sponte. Isn't it sui sponte then? No, Your Honor. And the district court said it's authenticity. No, Your Honor, because remember, this is their only witness. Okay? And we're saying this guy has no personal knowledge and has no foundation to testify about anything. Subsumed within that objection is the authentication of any documents. Doesn't he get a shot once he gets noticed? All right, if there's an issue with authentication, let me at least make an argument about it. But if somebody's saying that your only witness has no foundation to testify, subsumed within that is how you would authenticate. There's several ways you can authenticate a document under Federal Rule of Evidence. Right? I think it's 901. Yeah. The primary one is a witness's testimony. Right. We're saying, by the way, it says witness's testimony with personal knowledge. It's a witness with knowledge. Our point was, he has no knowledge. That's subsumed. Doesn't he have the source code that he could go back to the source code and reproduce the information that in 2017 is similar to 2012 and is similar? So he has some knowledge based on the fact that he has the source code. And they have testimony to say that it's been consistently the same over the years. So that was the mantra during the deposition, sort of. And there were parts of the deposition where he conceded that he really couldn't do that. But then any ambiguity about whether or not he could do that was cleared up by his second declaration where they said, because we were pushing them with discovery, saying, hey, if you can go do that, do it for us. And he conceded that, in fact, they couldn't do it. So he only had two sources of personal knowledge. What he called his day-to-day observations of the website. And secondly, his ability to recreate those website pages through the use of the old code and implementing that code to create the new. And he ultimately conceded that he couldn't do either of those for 2012 because he didn't start working in it for 2013, so he didn't have any day-to-day knowledge. And he tried to recreate it and couldn't. So he has no basis for personal knowledge. He confines himself by saying, the only two bases for knowledge I have is my observation day-to-day of the website and my ability to recreate it. And he conceded that he couldn't do either. So 2012 is gone. They don't have a witness that can testify to anything. All they can testify to is that generally during that time frame, it was their intent to bind people by having an arbitration provision in the terms of use and having buttons that would hopefully bind people through their assent by clicking those buttons. But to actually come to the conclusion that we have clear and unmistakable consent and manifestation of intent, you have to look and see how the notice was given and whether it was conspicuous or not. We can't do that. The district court couldn't do it. And this court can't do it because the defendant can't do it. They can't show us what we have to be able to see to even give us a chance, give them a chance to reasonably cause us to infer his intent to bind himself. But there is some evidence that your client entered the pre-sale code on some page of the website in 2017 that virtually all pages have included the terms of use disclosure since 2007. I mean, there is that evidence. Doesn't that create a material issue of fact? I don't think so. 2017. His testimony was he went straight from the band's Facebook web page to this single page. So by entering that special code, that's where it took him. He never had to interact with the website in any way from which you could even reasonably conclude there was any manifestation of intent to bind himself to arbitration. No jury could reasonably find that. For the record, because we're going to eventually. You're holding up something. You just identify what page it appears on. I did earlier. I'll do it again. Your Honor, it's Appendix 181. Great. And this is the screenshot from my client's cell phone screen. That's why it has some cracked glass on it. It's a separate lawsuit. Your Honor, if there's nothing else, that's all I have. Thank you. All right. Thank you, counsel. Then we'll hear rebuttal. We'll reply. Thank you. So client's counsel talks a lot about and read a few quotes of what Mr. Hahn couldn't produce. What he doesn't read is the evidence of what he can produce. And so I'll refer the court to page 12 of my reply brief where we explain and have cites to the record where Mr. Hahn said that the footers, the accept and continue buttons, the place, submit order buttons, all were static and version controlled. So he could bring up all those documents to show that based on the design of the website in 2012, plaintiff had to submit and accept the terms of use before he could purchase tickets. Also, plaintiff's counsel states that there's these contradictions between the Mr. Hahn's declaration that there isn't. In the first declaration, Mr. Hahn's explained that based on the design of the website and the documents that are version controlled and static, he was able to retrieve that the plaintiff had to agree to terms of use before he could purchase tickets. And then in arbitration discovery and in plaintiff's opposition, plaintiff complained that we had to reproduce the exact version of the 2012 website or at least explain why we couldn't. That's the only reason we submitted the reply declaration, to say, listen, we can produce certain things, the ones that are version controlled and they're static, but we can't produce the exact version. And so we were just trying to explain why we couldn't. But that does not undermine his conclusion or change his conclusion. And in the second declaration, he reiterates his conclusion that based on the design of the website and the code and the documents that he was able to retrieve, that his conclusion stays the same. That the plaintiff would not be able to purchase tickets in 2012 unless he accepted the terms of use. So there's no contradiction between the declarations. We're just trying to explain why we couldn't produce the exact 2012 version. Also, I think plaintiff greatly misstates what his client's declaration says. He never says that he only went to one page to look at the declaration. He didn't say that at all. He says that while on defendant's website in 2017, he entered a code and tried to purchase tickets. In fact, if you look at his own screenshot to the cell phone, you'll see that he put two under the number of tickets. He clicked the box for accessible. And then he clicked the button, obviously, to find out whether there are any tickets available. And he came and the message came across, sorry, there are no accessible tickets available. Everyone knows that websites don't magically respond to you that there are no tickets available unless you submit a query. So I think the evidence completely shows that he interacted with the website. In fact, he says he went there on multiple days and did the same thing. And the main evidence that the district court relied on to find that plaintiff did not consent in 2017 was Exhibit M. He says, crucially, Exhibit M does not contain a term of use disclosure. Well, it does. Plaintiff concedes that in his opposition brief. It does contain a term of use disclosure. So the entire evidence that the district court relied on to conclude that the plaintiff did not agree to arbitrate in 2017 is belied by the record. The court, for some reason, didn't notice that it had a term of use disclosure. All right. Thank you, counsel. We thank counsel for their excellent briefing and oral argument today. We'll take the case under advisement. We'd also like to greet counsel at sidebar if counsel's amenable. And we'd ask the clerk to adjourn court for the day. All rise. The court is adjourned until the end of the day. Six. We hope. Thanks, guys. Great job. Great job. Well done. All right. Thanks, guys. Thank you. Great job. Thank you. Thank you. Thank you. Thank you.  Thank you.